# In the United States Court of Federal Claims

No. 24-248
(Filed Under Seal: January 13, 2025)
Reissued: January 29, 2025[1]

|  |  |
|---|---|
| RELI GROUP, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| HEALTHCARE MANAGEMENT SOLUTIONS, LLC, | ) |
| Defendant-Intervenor. | ) |

*John R. Prairie*, Wiley Rein LLP, Washington, D.C., for the plaintiff.

*Patrick Angulo*, U.S. Department of Justice, Washington, D.C., for the defendant.

*James E. Whytsell*, Stinson LLP, Denver, CO, for the defendant-intervenor.

**MEMORANDUM OPINION**

***SMITH*, Senior Judge**

This bid protest is before the Court on the parties' Cross-Motions for Judgment on the Administrative Record. Plaintiff, RELI Group, Inc. ("RELI"), challenges a task order award to defendant-intervenor, Healthcare Management Solutions, LLC ("HMS"), by defendant, the United States of America, through the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services (the "Agency") for medical auditing services under Request for Quotation No. 240287 (the "Solicitation"). *See generally* Amended Complaint, ECF No. 28 [hereinafter Am. Compl.]; *see also* Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 24 [hereinafter Pl.'s MJAR]; Defendant's Cross-Motion for Judgment on the

---

[1]   An unredacted version of this opinion was issued under seal on January 13, 2025. Defendant responded to the Court's call for redactions, and this decision reflects the Court's ruling on the proposed redactions.

1

Administrative Record and Motion to Dismiss, ECF No. 31 [hereinafter Def.'s CMJAR]; Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record, ECF No. 30 [hereinafter Def.-Int.'s CMJAR].

As with most garden-variety bid protests, the main issue is whether the agency reasonably followed the Solicitation's evaluation criteria in the procurement conducted under Federal Acquisition Regulation ("FAR") Part 8.4. Specifically, RELI argues that the Agency violated the terms of the Solicitation by considering only the two lowest priced offerors, HMS and ███████████████████████████████, when the Solicitation mandated a best-value tradeoff source selection methodology; and by improperly holding discussions with only those two offerors. *See* Pl.'s MJAR at 15–26. RELI also argues that the same conduct violates the FAR's mandate that agencies treat offerors fairly and impartially. *Id.* at 19–22. Lastly, RELI argues that the Agency followed neither the Solicitation nor the FAR in its price evaluation. *Id.* at 22–24.

In response, defendant moves to dismiss RELI's protest for lack of jurisdiction on standing grounds because RELI is not an "interested party" that would have had a substantial chance at contract award but for the alleged errors in the procurement process. *See* Def.'s CMJAR at 14–15. Specifically, defendant argues that RELI has no standing because RELI: (1) incorrectly describes itself as "the highest technically rated offeror"; (2) proposes a high price creating a substantial disadvantage; and (3) alleges errors that did not impact its chance for award. *Id.* at 15–16. Defendant also cross-moves for judgment on the administrative record, arguing that the award to HMS was proper because the Agency followed the Solicitation requirements and did not act arbitrarily, capriciously, or contrary to law. *Id.* at 18–45. Defendant addresses each of the issues raised by RELI, explains how the record undermines RELI's argument and supports the Agency's final award decision, and illustrates that, even if RELI were correct, it fails to show prejudice. *Id.* HMS argues much the same as defendant in its cross-motion, except that it details the Agency's alleged proper evaluation of its proposal. *See* Def.-Int.'s CMJAR at 20–45.

As described in detail below, the Court finds in favor of defendant and defendant-intervenor. Accordingly, plaintiff's Motion for Judgment on the Administrative Record is denied, and defendant's and defendant-intervenor's Cross-Motions for Judgment on the Administrative Record are hereby granted.

## I.    Background

### A.    The Solicitation

On October 11, 2023, the Agency issued the Solicitation for "Validation Clinical Data Abstraction Services" for the creation and use of an auditing program for skilled nursing facilities ("SNFs") for the Agency's purchasing program under the procedures of the Federal Supply Schedules ("FSS"). Administrative Record 130–31, ECF No. 22 [hereinafter AR]. The

2

Agency issued the Solicitation under the simplified procedures of FAR Part 8.4, and the Solicitation stated that this procurement was "not a source selection under FAR Part 15," and that the procedures in FAR Subparts 15.1, 15.2, and 15.3 "do not apply." AR 155. The Solicitation contemplated a five-year period of performance consisting of a one-year base period and four one-year option periods. AR 127.

The Solicitation also stated that, once the Agency "determines the Offeror that is best-suited (i.e., the apparent successful contractor)," the Agency may "communicate with only that Offeror to address any remaining issues, if necessary, and finalize a task order with that contractor." AR 155. The Solicitation went on to state that, "[i]f the parties cannot successfully address any remaining issues," as determined by the Agency, then the Agency may "communicate with the next best-suited Offeror based on the original analysis and address any remaining issues." *Id.*

The Agency would use three evaluation factors in reviewing proposals: technical approach, prior experience, and price. AR 156. Technical approach was given more weight than prior experience, but both technical approach and prior experience, when combined, were approximately equal to price. AR 156–57. Lastly, the Agency would use a "trade-off process to determine which proposals represent the best value to the Government." AR 157.

    **B.**    **The Agency's Evaluation**

        **i.**    **Initial Evaluations**

The Agency received eight proposals. AR 1188. In its initial evaluation of these proposals, the agency assigned strengths and weaknesses to each offeror. AR 1188; AR 1148. The agency also assigned confidence levels for each offerors' non-price factors (*i.e.*, technical approach and prior experience), as well as an overall confidence level. AR 1183. The Agency summarized its results in the following chart:

| Offeror | Total Price | Technical Rating | Prior Experience Rating | Overall Rating | Intent to Negotiate |
|---|---|---|---|---|---|
| ███ | ███ | ███ | ███ | ███ | ███ |
| RELI Group | ███ | High Confidence | High Confidence | High Confidence | No |
| ███ | ███ | ███ | ███ | ███ | ███ |
| HMS | $ 40,774,830 | High Confidence | High Confidence | High Confidence | Yes |
| ███ | ███ | ███ | ███ | ███ | ███ |

AR 1188.

Of note, ███ received an overall rating of "Some Confidence," meaning that, although the Agency had some doubt as to whether it would successfully perform the contract, the strengths outweighed the weaknesses. *Id.* Additionally, HMS and RELI received overall ratings of "High Confidence," meaning that the Agency identified no deficiencies or weaknesses and had no doubt that they would successfully perform the contract. *Id.*

The Agency also evaluated each offeror's total price, compared the total prices with the Independent Government Cost Estimate ("IGCE") of $24,076,930, and found that, because there were multiple offerors, the procurement obtained adequate price competition. AR 1042; AR 1188; AR 1195.

In documenting the evaluation results, the Agency listed the solicitation criteria for each factor and then listed narrative summaries for each offeror individually under each factor. AR 1188–95. The Agency did not, at this stage of the procurement, document a comparison among offerors in its initial evaluation other than stating that "███ and HMS were both viable offers," that ███'s price was "well below the next offer," and that HMS had "the second lowest overall cost." AR 1196. When the Agency chose the top two offerors with which to have discussions, ███ and HMS, the Agency stated that both were "technically acceptable and represented the two lowest costs to the government." *Id.*

ii.     **Discussions**

On January 9, 2024, the Agency began conducting discussions with the two offerors it had deemed viable, ███████ and HMS. AR 1196–1206. The Agency sent both offerors letters, on the same day, with "clarifying questions" regarding their technical and price proposals as well as responses to assumptions made in their price proposals. AR 1198; AR 1203; AR 1428.

iii.    **Final Evaluation and Award Decision**

After holding discussions, the Agency determined that ███████'s proposal was technically unacceptable and assigned it a new overall ranking of "Low Confidence." AR 1430. The Agency similarly determined that ███████'s proposed price was unreasonably low. AR 1431. Additionally, the Agency decided that HMS's responses to the Agency's communications "did not change [its] overall confidence rating," but the Agency did convert one of HMS's weaknesses to a strength, making the Agency more confident in HMS. AR 1430. The Agency also "accepted all assumptions and assumption clarifications made by HMS" from the discussions. AR 1431.

On January 29, 2024, the Agency produced a more formal technical evaluation document, where it compared all offerors with each other instead of listing non-comparative, individual summaries. AR 1434–41. For example, the Agency stated that among the proposals:

> "the degree of understanding . . . varied greatly . . . . HMS and ███████ provided all the components of the auditing process[;] [and] . . . Reli, ███████, and ███████ all provided technical approaches that could meet the needs of this contract work . . . . The key piece that is missing from . . . ███████, ███████, ███████, ███████, and ███████ is their response to how they will handle nonresponsive SNFS after the initial attempt to acquire the medical charts . . . . ███████, ███████ and ███████ all proposed approaches that meet the needs of the contract work with regards to their ability to demonstrate a scoring methodology for auditing assessments . . . . ███████ and ███████ both had significant issues in their proposed approaches, [e.g.,] ███████ heavily relying on a tool that they have not tested . . . ."

AR 1434–37. The Agency again stated that, "[a]s there were multiple offerors, adequate price competition was obtained." AR 1431.

The Agency's Technical Evaluation Panel ("TEP") recommended that the Contracting Officer award the contract to HMS for being the second lowest price and receiving an overall rating of high confidence, and because ███████ was found to be technically unacceptable during discussions, with a price that suggested that ███████ misunderstood the Solicitation's requirements. AR 1440–41. The Contracting Officer ultimately awarded the

contract to HMS, finding that "the level of effort provided by HMS will save the government time, money, and effort overall," that HMS "can perform the work on time and within budget with little government interference," and that HMS presents a "low risk of an unsuccessful contract performance." AR 1432.

On February 2, 2024, the Agency notified the offerors that it awarded the contract to HMS. AR 1448–54. The Agency told RELI that its "submission was among the highest rated technical proposals, but the total proposed costs did not offer the overall best value to the government." AR 1453.

C.     **Procedural History**

On February 12, 2024, plaintiff filed its Complaint with this Court, protesting the Agency's decision to award the contract to HMS. *See generally* Complaint, ECF No. 1. On March 5, 2024, defendant filed the Administrative Record. ECF No. 22. On March 26, 2024, plaintiff filed its Motion for Judgment on the Administrative Record ("Motion"). Pl.'s MJAR, ECF No. 24. On April 16, 2024, defendant and defendant-intervenor filed their Responses and Cross-Motions for Judgment on the Administrative Record (collectively, "Cross-Motions"). Def.'s CMJAR, ECF No. 31; Def.-Int.'s CMJAR, ECF No. 30. Defendant also moved in its Cross-Motion to dismiss plaintiff's claims for lack of subject matter jurisdiction. *See* Def.'s CMJAR at 11–17. On April 23, 2024, plaintiff filed its reply in support of its Motion and its response to the Cross-Motions. Plaintiff's Reply, ECF No. 32. On April 30, 2024, defendant and defendant-intervenor filed their replies. Defendant's Reply, ECF No. 34; Defendant-Intervenor's Reply, ECF No. 33.

On May 21, 2024, the Court held Oral Argument. On June 10, 2024, the Court issued an Order granting defendant's and defendant-intervenor's Cross-Motions and denying plaintiff's Motion. *See* June 10, 2024, Order, ECF No. 38. In that Order, the Court explained that a memorandum opinion would follow, explaining, in detail, the Court's decision. *Id.* at 1. This is that opinion.

II.    **Standard of Review**

The Tucker Act grants this Court jurisdiction over bid protest actions. 28 U.S.C. § 1491(b)(1). This Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for agency actions, where agency actions may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *See* 28 U.S.C. § 1491(b)(4) (incorporating 5 U.S.C. § 706 by reference); *see also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). The Court will "interfere with the government procurement process 'only in extremely limited circumstances,'" *EP Prods., Inc. v. United States*, 63 Fed. Cl. 220, 223 (2005) (quoting *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983)), and it will not substitute its judgment for that of the agency, *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).

"[A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (collecting cases). Under the first part, the Court recognizes that "contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." *Id*. (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). The test for courts is whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.* at 1332–33 (internal citation omitted). If "the court finds a reasonable basis for [an] agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citation omitted).

When a challenge is brought under the second part, the protestor must show that the alleged violation was a "clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333 (citation omitted). Therefore, if the agency's procurement decision lacked a rational basis or is contrary to law, the court will then "determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351; *see also Sys. Stud. & Simulation v. United States*, 22 F.4th 994, 996–98 (Fed. Cir. 2021). "In either case, however, the protestor bears the heavy burden of proving the lack of a rational basis or a violation of law by a preponderance of the evidence." *Benchmade Knife Co. v. United States*, 79 Fed. Cl. 731, 735 (2007).

A party may file a motion for judgment on the administrative record requesting that the Court assess "whether the administrative body, given all disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review," pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims. *See Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369, 382 (2013). On such a motion, the parties are limited to the administrative record, and the Court must make findings of fact as if it were conducting a trial on a paper record. R. Ct. Fed. Cl. 52.1; *Bannum*, 404 F.3d at 1354. The Court will then determine whether a party has met its burden of proof based on the evidence in the record. *Bannum*, 404 F.3d at 1355.

### III.   Discussion

The issues before the Court are whether the Agency complied with the Solicitation requirements regarding discussions and whether the Agency conducted a proper best-value tradeoff and properly considered price. The Court is also faced with whether, if the Agency did err, RELI was prejudiced as a result. The Court finds that the Agency was not required to hold discussions with all offerors because this was a FAR Subpart 8.404(a) procurement which, unlike FAR Part 15, does not require an agency to conduct discussions with all offerors. The Agency additionally did not elect to use FAR Part 15 discussion procedures based on the language in the Solicitation that it would only conduct discussions with two offerors, at most. The Agency also did not violate any fundamental fairness principles in not conducting discussions with all offerors. However, the Court finds that the Agency violated the sequential aspect of discussions

7

based on the Solicitation language, but that this did not prejudice RELI.  Lastly, the Court finds that the Agency properly conducted a best-value tradeoff.  Each issue is addressed below.

      A.      **The Agency's Application of the Solicitation Requirements**

            i.      **The Agency was not required to hold discussions with all offerors.**

Because FAR 8.404(a) does not require discussions with all offerors, and because the Agency did not elect to use FAR Part 15 procedures, the Agency was not required to hold discussions with all offerors.  Agencies are not required to hold discussions with all offerors in FAR Subpart 8.4 procurements; holding discussions with all offerors is instead a FAR Part 15 procurement requirement.  FAR 8.404(a) ("FAR Part 15 . . . is explicitly made inapplicable to FSS contracts."); *AccelGov, LLC v. United States*, 170 Fed. Cl. 508, 516 (2024).  However, if an agency "elect[s]" to use FAR Part 15 procedures in a FAR Subpart 8.4 procurement by having its solicitation provide for FAR Part 15 discussions with all offerors, and by accordingly conducting discussions with all offerors, then the FAR Part 15 rules for discussions and fairness apply.  *Centerra Group, LLC v. United States*, 138 Fed. Cl. 407, 411, 414 (2018); *Distributed Solutions, Inc. v. United States*, 106 Fed. Cl. 1, 15 (2012) ("Case law suggests that relatively clear intentions that FAR Part 15 procedures will be used [in FAR Subpart 8.4 procurements] is necessary to trigger their application to a procurement.").

The Agency here was neither required, nor even permitted, to have discussions with all offerors because the Solicitation only allowed discussions with two offerors, at most.  AR 155.  Additionally, the Agency issued this Solicitation under the simplified procedures of FAR Part 8.4, and the Solicitation stated that this procurement was "not a source selection under FAR Part 15," and that the procedures in FAR Subparts 15.1, 15.2, and 15.3 "do not apply."  AR 155.  The Agency was therefore not required to hold discussions with all offerors because of the Solicitation language as well as the language from FAR Subpart 8.404(a) that FAR Part 15 is "inapplicable" to FSS contracts, *e.g.*, this procurement.  FAR 8.404(a).

            ii.      **The Agency did not violate fundamental fairness principles.**

The Agency based its award decision on its initial evaluation of HMS and only used discussions to confirm its initial finding that HMS was the "next best-suited offeror," thereby not violating any fundamental fairness in the procurement process.  AR 155.  Fundamental fairness will still be reviewed in procurements even where FAR Part 15 does not apply.  *Unisys Corp. v. United States*, 89 Fed. Cl. 126, 140 (2009) (Looking to FAR 1.102–2(c)(3), that all offerors must be treated fairly and impartially, but not the same, to determine whether an agency violated fundamental fairness in an FSS procurement).  The application of fundamental fairness is specific to and dependent on the facts of each case.  *Centerra*, 138 Fed. Cl. at 415.  For instance, fundamental fairness is violated in a FAR Subpart 8.4 procurement where an agency conducts multiple rounds of discussions with each offeror, but then conducts discussions with only the awardee in the last round.  *Id.* at 411, 417.  On the other hand, for example, fundamental fairness

is not violated where an agency conducts discussions with only some offerors during a FAR Subpart 8.4 procurement but bases its award decision on offerors' initial proposals submitted before discussions, even if the agency gathered additional helpful information during discussions. *Unisys*, 89 Fed. Cl. at 140–41.

RELI argues that, because of the fundamental principle of treating all offerors fairly, when an agency opens discussions with some offerors, it must always open discussions with all offerors. Pl.'s MJAR at 20 (citing *Centerra*, 138 Fed. Cl. at 411, 417). This is simply incorrect as FAR Subpart 8.404 explicitly states that FAR Part 15 (*e.g.*, FAR Subpart 15.306(d), which requires agencies to have discussions with all offerors in the competitive range) is not applicable to FSS contracts.

RELI's reliance on *Centerra* is improper. In *Centerra*, the Court found that, in a FAR Subpart 8.4 procurement, the agency violated fundamental fairness by having multiple rounds of discussions, the first two rounds with each offeror, but the third round with only the awardee, in which it informed the awardee of the flaws in its proposal and allowed only the awardee the opportunity to revise and improve its proposal. *Centerra*, 138 Fed. Cl. at 411, 417. Giving only the awardee the opportunity to improve its proposal was the unreasonable and unfair treatment. *Id.* at 417. But here, the Agency's discussions did not allow HMS the opportunity to revise and improve its proposal. Instead, the Agency conducted discussions here only to confirm proposals, not for offerors to improve their proposals, and based its evaluation on offerors' initial proposals, which does not violate fundamental fairness principles.

Indeed, RELI's argument ignores the holding from *Unisys* that an agency does not violate fundamental fairness in a FAR Subpart 8.4 procurement by conducting discussions with only some offerors if it bases its award decision on offerors' initial proposals. *Unisys*, 89 Fed. Cl. at 140–41. The Agency here, like the agency in *Unisys*, based its award decision on its initial evaluation of HMS, and only used discussions to confirm its initial finding that HMS was the "next best-suited offeror" and should be awarded the contract should the Agency find unresolved issues with the "apparent offeror," ▮▮▮▮▮▮, during discussions. AR 155. Even though the Agency received helpful information during discussions that changed HMS's weakness to a strength, the Agency's decision was still based on its initial evaluation of HMS's proposal, which was confirmed by discussions, because the discussions with HMS only "ask[ed] clarifying questions" and "did not change [HMS's] overall confidence rating." AR 1428, 1430. Because the award decision was based on initial evaluations, which were only confirmed by discussions, the Agency's discussions were not unfair to RELI because no offeror had the exclusive opportunity to improve its proposal at the expense of other offerors. The Agency therefore did not violate fundamental fairness, per *Unisys*.

        **iii.**        **The Agency's discussions did not comply with the sequential requirement for discussions as instructed by the Solicitation.**

The Agency violated the terms of the solicitation by conducting discussions with ▮▮▮▮ and HMS at the same time. An agency "must follow the terms of [its] solicitation when

9

awarding a contract." *Assessment and Training Solutions Consulting Corporation v. United States*, 173 Fed. Cl. 123, 127 (2024) (quoting *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 397 (2021); FAR 8.405-2(d) ("The ordering activity shall evaluate all responses received using the evaluation criteria provided to the schedule contractors.").

The Solicitation stated that, once the Agency "determines the Offeror that is best-suited (i.e., the apparent successful contractor)," the Agency may "communicate with only that Offeror to address any remaining issues, if necessary, and finalize a task order with that contractor." AR 155. The Solicitation went on to state that, "[i]f the parties cannot successfully address any remaining issues," as determined by the Agency, then the Agency may "communicate with the next best-suited Offeror based on the original analysis and address any remaining issues." *Id.* This is not what the Agency did. Instead of communicating with the top offeror and then communicating with the second-best offeror if issues were not resolved with the top offeror, the Agency communicated with both offerors at the same time. AR 1198; AR 1203. The Agency therefore violated the terms of the Solicitation regarding the order in which it would conduct discussions. However, as explained later in the opinion, plaintiff was not prejudiced by this violation.

    iv.   **The Agency conducted a proper best-value tradeoff.**

The Agency documented its comparison of all proposals in its final evaluation, therefore using a tradeoff methodology, not a Lowest Price Technically Acceptable ("LPTA") methodology. When conducting a best-value tradeoff, an agency may choose an offeror with a higher price by judging that an offeror's technical benefits are worth the price premium. *Croman Corp. v. United States*, 106 Fed. Cl. 198, 220 (2012). In doing so, the agency must compare the price and non-price factors among the offerors to determine the best value to the government. *Serco Inc. v. United States*, 81 Fed. Cl. 463, 466 (2008). A best-value tradeoff is unlike using the LPTA methodology, where an agency must choose the lowest priced offeror that also meets minimum technical requirements. *Universal Marine Co., K.S.C. v. United States*, 120 Fed. Cl. 240, 245 n.4 (2015).

The Agency conducted a proper tradeoff, as shown in its final evaluation. The Solicitation stated that the Agency would use a tradeoff when evaluating proposals, which it did, as clearly documented in its final evaluation before the award decision. The Solicitation did not state that best-value tradeoffs done during preliminary evaluations had to be documented; just that the Agency had to conduct a tradeoff, which it did after discussions, if not during the entire technical evaluation. The final evaluation conducted after discussions provides the proper documentation necessary to prove that a tradeoff occurred because the Agency compared and weighed the advantages and disadvantages of each offeror's proposal. For example, the Agency stated that "HMS and ▮▮▮▮ provided all the components of the auditing process . . . . Reli, ▮▮▮▮, and ▮▮▮▮ all provided technical approaches that could meet the needs of this contract work . . . . The key piece that is missing from . . . ▮▮▮▮, ▮▮▮▮, ▮▮▮▮, and ▮▮▮▮ is their response to how they will handle nonresponsive SNFS . . . . ▮▮▮▮ and ▮▮▮▮ both had significant issues in their proposed approaches, [*e.g.,*] ▮▮▮▮

▮ heavily relying on a tool that they have not tested . . . ." AR 1434–37. This comparison among all offerors is a tradeoff.

FAR Subpart 8.4 imposes minimum documentation requirements, including a rationale for an agency's tradeoff in making its award decision. FAR 8.405-2(f)(5). However, FAR Subpart 8.4, unlike FAR Part 15, does not require an agency to "document every decision it makes in rigorous detail." *Trillion ERP Venture Tech LLC v. United States*, 161 Fed. Cl. 531, 554 (2022) (internal citations omitted).

Even though the Agency's initial evaluation did not perfectly document a tradeoff due to its lack of comparison among offerors and use of individual narrative summaries, this does not take away from the fact that the Agency properly documented its tradeoff during its final evaluation. All the Solicitation required regarding a tradeoff was that it be done to determine the best value to the government, which the Agency did. In terms of the initial evaluation, the Solicitation also only stated that this would be an "original analysis," not the sole instance of conducting a tradeoff. AR 155. This initial evaluation, as the original analysis leading to discussions, formed the basis of the tradeoff conducted and properly documented during the final evaluation because it informed discussions which informed the final evaluation. Furthermore, even though the Agency used LPTA language in its initial evaluation when it stated that both ▮ and HMS were "technically acceptable and represented the two lowest costs to the government," the tradeoff still occurred, nonetheless. AR 1196. The Agency may still document an emphasis on low price and technical acceptability in its tradeoff evaluation because the solicitation stated that it would value price just as much as it would value the non-price factors. Here, the result was a recommendation to award the contract to the second lowest priced, technically acceptable (and superior) offeror, but LPTA was not the means to get there; rather, the properly documented tradeoff was.

Furthermore, the record does not show that the Agency only considered, in its tradeoff, the two offerors with which it had discussions, as RELI claims. Indeed, it shows the opposite. All eight offerors were named in the final evaluation, which sufficiently documented the tradeoff by comparing the advantages and disadvantages of each of the eight offerors.

          v.        **The Agency reasonably evaluated offerors' price proposals.**

The Agency conducted a reasonable price evaluation because the Solicitation did not require the Agency to perform a price realism analysis and because the Agency adequately considered HMS's level of effort. "An agency is required to evaluate proposals only in accordance with the terms of the solicitation." *NVE, Inc. v. United States*, 121 Fed. Cl. 169, 180 (2015). In a fixed-price contract, price realism analyses are not ordinarily required because, in a fixed-price contract, the contractor bears the risk of financial loss. *Id.* Thus, for a price realism analysis to be required in a fixed-price contract, the solicitation must expressly or implicitly require the agency to perform a price realism analysis. *Id.*; *KSC Boss Alliance, LLC v. United States*, 142 Fed. Cl. 368, 392 (2019). FAR Subpart 8.4 procurements, *i.e.*, Federal Supply Schedule (FSS) procurements, are fixed-price procurements. FAR 8.404(d).

11

RELI's arguments that the Agency unreasonably evaluated price are unpersuasive. RELI first argues that the Solicitation "*required* the Agency to conduct a price realism analysis if it was in the Agency's best interest to do so," Pl.'s MJAR at 23 (emphasis added), but that is incorrect. This is a fixed-price procurement because it is a FAR Subpart 8.4 procurement, thus, the Solicitation must require a price realism analysis for one to apply. FAR 8.404(d); *KSC Boss Alliance*, 142 Fed. Cl. at 392. However, the Solicitation stated that the Agency "*reserves the right* to perform a price realism analysis" if it is in the Agency's best interest. AR 161 (emphasis added). "Reserves the right" can be rephrased as the Agency *may* do something, whereas "required" can be rephrased as the Agency *must* do something. *Id. May* and *must* are not the same. "Reserves the right" means the Agency could have performed a price realism analysis, but it did not have to. *Id.* The Agency was thus not required to perform a price realism analysis.

In FSS procurements, an agency must consider an offeror's "level of effort and the mix of labor proposed to perform" the solicitation's statement of work. FAR 8.405-2.

RELI's second argument, that the Agency violated the FAR by not considering HMS's "level of effort and the mix of labor proposed to perform" the statement of work, FAR 8.405-2, also fails because the Agency's considerations of HMS's proposed labor and effort is detailed, clearly and at length, from the Agency's tradeoff and award recommendation. AR 1432. Indeed, the Agency stated that "the *level of effort* provided by HMS will save the government time, money, and effort overall," that HMS "can perform the work on time and within budget with little government interference," and that HMS presents a "low risk of an unsuccessful contract performance." *Id.* (emphasis added). The Agency therefore complied with FAR 8.405-2.

### B.   Prejudice

RELI fails to establish prejudice for its claim that the Agency improperly held discussions because the Agency's error in not conducting discussions sequentially did not affect the award decision or RELI's chances for award. A protestor must demonstrate that it was prejudiced by an agency's error. To show prejudicial error, a protestor must show a "substantial chance" that the agency "would have made a different award decision but for the alleged error." *Id.*; *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

Showing a "substantial chance" that the agency's award decision would have changed but for its error does not require the protestor to prove that it was "next in line" for award and that it thus would have been awarded the contract but for the error. *See Rev, LLC v. United States*, 159 Fed. Cl. 80, 90 (2022); *see also Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). However, the protestor must show that, at a minimum, its chances of contract award would have increased but for the error. *Precision Asset Management Corp. v. United States*, 125 Fed. Cl. 228, 233 (2016). Accordingly, harmless errors by an agency during a procurement, *i.e.*, errors that do not affect the substantial rights of the parties and would not lead to a different result, do not justify relief. *IAP Worldwide Services, Inc. v. United States*, 160 Fed. Cl. 57, 86 (2022).

RELI was not prejudiced by the Agency's error in not conducting discussions sequentially because this error did not affect the Agency's award decision, or increase RELI's chances for award, and was therefore harmless. Had the Agency followed the terms of the Solicitation by having discussions with ▮▮▮▮▮▮▮ and HMS sequentially, the Agency would have still awarded the contract to HMS because the Solicitation allowed for the Agency to turn to the "next best-suited" offeror, *i.e.*, HMS, if problems arose with the "apparent offeror," *i.e.*, ▮▮▮▮▮▮▮, during discussions. AR 155. This Solicitation language essentially limited the substantial chance of award to the top two offerors established after the initial evaluation and before discussions. Because the Agency's error concerns the order of discussions, which occurred after the Agency had already determined the top two offerors with which to have discussions, *i.e.*, the only offerors with a substantial chance of award, the error had no impact on RELI's chance for award. In other words, RELI was not prejudiced because its chances for award did not increase because it was not one of the top two offerors to which the Agency would have awarded the contract.

Furthermore, RELI was, at most, the third-best offeror, with the same technical ratings as HMS, the second-best offeror, but with a price over ▮▮▮▮▮▮▮ higher than HMS. The Agency would not have chosen RELI over HMS but for the error even if, hypothetically, the Solicitation allowed for discussions with RELI. Perhaps, if the Agency found unresolved errors with HMS during discussions, then RELI's chances for award would have increased, thus prejudicing it. But that is not what happened. And because the Agency's error did not affect the award decision, as the Agency would have still found issue with ▮▮▮▮▮▮▮ and would have still been satisfied with HMS had it conducted discussions sequentially, the error was harmless and therefore did not prejudice RELI.

### IV.   Conclusion

For the reasons set forth above, defendant's Motion to Dismiss is hereby **GRANTED**. In the alternative, plaintiff's Motion for Judgment on the Administrative Record is hereby **DENIED**, and defendant's and defendant-intervenor's Cross-Motions for Judgment on the Administrative Record are hereby **GRANTED**. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*
Loren A. Smith,
Senior Judge